# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Purple Apple iPhone with black case, seized from the person of Jose Daniel RAMIREZ on February 8, 2023 | Case No.  '23 MJ0502 MSB |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the    Southern    District of    California    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC sec. 841, 846 | Distribution of Controlled Substances, Possession w/ Intent to Distribute Conspiracy |

The application is based on these facts:
See Attached Affidavit of HSI Task Force Officer Douglas Morse, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

HSI Task Force Officer Douglas Morse
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
   telephone    *(specify reliable electronic means)*.

Date:    02/10/2023   
*Judge's signature*

City and state:  San Diego, California    Hon. Michael S. Berg, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Douglas Morse, being duly sworn, hereby state as follows:

## I.

## INTRODUCTION

1. This affidavit supports an application for warrants to search the following electronic devices:

- A purple and silver Apple iPhone with clear case, seized from the person of Jose Daniel RAMIREZ on February 8, 2023 ("**Target Telephone 1**").
- A purple Apple iPhone with black case, seized from the person of Jose Daniel RAMIREZ on February 8, 2023 ("**Target Telephone 2**").
- A grey Samsung phone, with an IMEI ending in -5521, found in the bedroom of Jose Daniel RAMIREZ on February 8, 2023 ("**Target Telephone 3**")
- A grey Samsung phone, with an IMEI ending in -2083, found in the bedroom of Jose Daniel RAMIREZ on February 8, 2023 ("**Target Telephone 4**")
- A black Coolpad phone, found in the bedroom of Jose Daniel RAMIREZ on February 8, 2023 ("**Target Telephone 5**").

The **Target Telephones** were seized from Jose Daniel RAMIREZ, and from his bedroom, on February 8, 2023, as further described in Attachments A-1 through A-5, and to seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841(a), 841(b)(1), and 846, as further described in Attachment B. The requested warrant relates to an investigation of RAMIREZ and others known and unknown, for criminal violations of the offenses identified above. The **Target Telephones** are currently in the custody of Homeland Security Investigations, 2055 Sanyo Avenue, Suite 120, San Diego, CA 92154.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the

**Target Telephones**, it does not contain all of the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## II.

## **EXPERIENCE AND TRAINING**

3. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18 of the United States Code. As such, I am empowered by law to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. 2516. I am a Task Force Officer with Homeland Security Investigations.

4. I am a peace officer employed by the County of San Diego Sheriff's Department and have been so employed for approximately 14 years. During my tenure, I have been assigned to the Courts, Patrol, Community Oriented Policing and Problem-Solving Unit, Area Investigations, the Special Investigations Division, and served as a Task Force Officer with the Drug Enforcement Administration. I am currently a detective assigned to the High Intensity Drug Trafficking Area (HIDTA) Group and attached to Homeland Security Investigations (HSI) as a Task Force Officer. This group focuses on multi-jurisdictional narcotics investigations and specializes in surveillance, bulk narcotics smuggling. and fentanyl overdose cases. Over the course of my career, I have been involved in over twenty narcotics related overdose investigations. I also conduct investigations in partnership with FAST, a multi-agency task force based in San Diego that focuses on disrupting and dismantling fentanyl distribution activity.

5. While working in these different positions, I have been involved in over 500 narcotics investigations in various capacities. I have received training available to law enforcement to keep proficient in my profession. This training includes but is not limited to: Domestic Violence; Interview and Interrogations courses; Arrest and Search Warrant Preparation courses; Court Room Testimony courses; Narcotics Investigations Courses and Basic Criminal Investigations courses. I possess an Advanced Certificate from the California Department of Justice on the Commission of Peace Officer Standards and

Training (POST) and hold a Master's in Business Administration. During the course of my duties, I have become familiar with the manner in which controlled substances are packaged, marketed, and consumed. During the course of my duties, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and techniques of traffickers in controlled substances as practiced locally. I have participated in the service of numerous search warrants involving controlled substances, possession of controlled substances, and possession of controlled substances for sale. I have conducted surveillance on known controlled substance dealers, as well as numerous occasions where I have observed controlled substances being sold to informants. I have spoken with numerous informants regarding controlled substance trends. I have also testified in court as an expert witness for the possession of illegal drugs for sale.

6. During the course of my duties, I have become familiar with the manner in which controlled substances are packaged, marketed, and consumed. During the course of my duties, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and techniques of traffickers in controlled substances as practiced locally. I have participated in the service of numerous search warrants involving controlled substances, possession of controlled substances, and possession of controlled substances for sale. I have conducted surveillance on known controlled substance dealers, as well as numerous occasions where I have observed controlled substances being sold to informants. I have spoken with numerous informants regarding controlled substance trends. I have also testified in court as an expert witness for the trafficking and possession of illegal drugs for sale.

7. The following is based on my own investigation, oral and written reports by other law enforcement officers, debriefs, database and public records checks, searches, phone analysis, and other investigation. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal

knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

8. Based upon my training and experience, consultations with other law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers often work in concert utilizing cellular/mobile telephones because they are mobile and provide instant access to calls, text messaging capabilities, social-media applications with communications functions, web, and voice messages.

    b. Drug traffickers often use cellular/mobile telephones in order to arrange the storage and distribution of their drugs.

    d. Drug traffickers often use cellular/mobile telephones to arrange meetings to make sales, to acquire drugs for sales, to provide payments drugs sold, to receive drugs to hold at stash locations, and other activities germane to trafficking.

    e. Drug traffickers often use cellular/mobile telephones to notify or warn accomplices of law enforcement activity, including the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

8. Based upon my training, experience, consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular

telephone. Specifically, searches of cellular telephones of individuals involved in the importation and/or transportation of narcotics may yield evidence:

   a. tending to indicate efforts to distribute federally controlled substances and conspire to do the foregoing;

   b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the distribution of federally controlled substances and conspire to do the foregoing;

   c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of federally controlled substances and conspire to do the foregoing;

   d. tending to identify travel to or presence at locations involved in the distribution of federally controlled substances and movement of cash proceeds, such as stash houses;

   e. tending to identify the user of, or person(s) with control over or access to, **Target Telephone 1**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III.

## FACTS SUPPORTING PROBABLE CAUSE

9. At about 7:00 p.m. on January 3, 2023, K.W.P.'s parents found K.W.P. just outside the family's home in Poway. K.W.P. was found on the ground, reclined against the ai-conditioning unit. He was not responsive and he had vomited on himself. K.W.P.'s mother called 911 while his father attempted to resuscitate K.W.P with CPR. Medical personnel arrived at the home first in response to the 911 call and transported K.W.P. to a nearby hospital. There, medical professionals attempted to revive K.W.P. for about ten minutes, and then pronounced him dead. Since this time, a urine screen for K.W.P. showed

5

the presence of fentanyl and cocaine in K.W.P.'s system. Additional preliminary testing of K.W.P's blood shows the presence of fentanyl and benzodiazepines. Final blood testing is pending.

10. Law enforcement responded to the 911 call by going to the house; K.W.P. was transported to the hospital around the same time that they arrived. Responding officers saw a pink straw wrapped in tinfoil on the ground near the air-conditioning unit. K.W.P.'s father reported that he had seen this item when he first moved K.W.P. as part of the resuscitation effort. The father also reported that he had taken K.W.P.'s phone from his son's pocket before K.W.P. was taken to the hospital; he provided this phone to law enforcement, along with the passcode.

11. From an interview of K.W.P.'s parents, I understand that K.W.P. had a history of fentanyl use, which included an overdose incident in April 2022. Further, K.W.P. had been undergoing drug addiction rehabilitation since that incident; his parents thought he had been sober prior to his death.

12. Investigators examined K.W.P.'s phone, and found a series of communications pertinent to this application. Specifically, they saw a series of text conversations between K.W.P. and a contact saved in his phone as "Dogwater." On January 3, 2023, he had the following exchange with Dogwater, which began at 2:39 p.m:

| | |
|---|---|
| K.W.P: | R u open |
| Dogwater: | Yeah |
| K.W.P: | Can I get the same as last time. 2 blues and skme tin foil |
| Dogwater: | Yeah send it. Lmk |
| K.W.P: | R u ready rn |
| Dogwater: | Te |
| K.W.P: | Bet. Before you dip. Can I have 2 darker ones. The lighter ones get watery. |
| Dogwater: | Some when sent. Lmk. |
| K.W.P: | I just sent it. |

| | | |
|---|---|---|
| 1 | Dogwater: | Ok |
| 2 | K.W.P: | Just 2 Percs and some tin foil |
| 3 | Dogwater: | Ok |
| 4 | K.W.P: | Try not to grab any white Percs. Same spot as usual too |

At 2:58 p.m., Dogwater sent K.W.P. a message that said, "Ok. On my way!" K.W.P. responded, "Bet." Later, Dogwater sent a message at 3:12 p.m. that said, "Here." K.W.P. said, "Hold up I'm peeing. I'll be right out." Dogwater wrote, "Lmkkk. I gotta dip." At 3:15 p.m., K.W.P. wrote, "Be ready."

      13.    From my experience investigating drug trafficking, I believe that when K.W.P. asked for "2 blues and skme tin foil," he was asking to purchase two counterfeit pharmaceutical pills laced with fentanyl, and "some" tin foil. (I believe "skme" is a typographical error.) I am aware that frequently, fentanyl is distributed in the form of counterfeit pharmaceutical pills that are round, blue, and stamped "M30." These pills are counterfeits of thirty-milligram Oxycodone pills; for no fewer than three years now, I have seen this form of pill as the near-exclusive form of counterfeit pill laced with fentanyl. (I am also aware that fentanyl is sold in powder form.) Here, I believe K.W.P. wanted to purchase these two pills to heat on the tinfoil and smoke. I note that as part of his request, K.W.P. specifically asked for "darker ones" because the "lighter ones get watery." I infer that here, K.W.P. wanted to avoid pills that he thought would be less potent, or somehow less enjoyable to use. Finally, I observe that from these communications, Dogwater traveled to K.W.P. to deliver the pills, arriving around 3:15 p.m. These observations, and the balance of the text messages, lead me to believe that "Dogwater" sold K.W.P. counterfeit pills on January 3, 2023.

      14.    In my review of these messages, I saw that the phone number for Dogwater ended in -4399 (the "4399 Number"). Investigators tried to conduct an undercover operation on January 4, using K.W.P.'s phone to reach out to the 4399 Number to arrange a purchase from Dogwater, but found that this person had stopped using the phone. This said, investigators conducted a review of open-source and law-enforcement databases, and

saw that the 4399 Number was associated with Jose Daniel RAMIREZ, at an address in San Diego. These checks also showed that Ramirez had a 2003 date of birth. Investigators also pulled the California DMV information for RAMIREZ.

15. Investigators attempted surveillance of residential locations that they could associate with RAMIREZ (such as by looking at vehicle-registration information), and were able to identify him on or about February 1, when they saw him coming out of an apartment complex where it appears his mother lives. Based on this identification of RAMIREZ, investigators were also able to identify the car he was driving, a 2013 black Mercedes Benz sedan. The next day (February 2), I obtained a geolocation warrant to track the movements of that Mercedes Benz.

16. Beginning no later than February 1, investigators saw that RAMIREZ regularly drove the Mercedes Benz to a business park in Mira Mesa. There, he has shown that he regularly parks at the end of a dead-end street for brief periods of time (*e.g.*, typically two or three minutes). Data from the geolocation device shows that he generally makes this trip several times per day. In my experience, this kind of activity is consistent with drug dealing: drug dealers often prefer to conduct deals in discreet, public areas, and to conduct the deals quite quickly. Here, there is no apparent reason why RAMIREZ would need to visit this office park, let alone several times per day. The fact that he does so, for brief periods of time, suggests to me that he is using this location to conduct drug deals while minimizing his potential exposure to law enforcement.

17. On Sunday, February 5, 2023, investigators conducted stationary surveillance of this office park, in an effort to see if RAMIREZ was in fact doing drug deals there. At about 10:30 a.m., investigators saw a third party, PERSON A, sitting in PERSON A's vehicle in the parking lot. This vehicle was the only vehicle there. An investigator walked up to PERSON A's vehicle and saw that PERSON A was reclined in the driver's seat, and appeared to be passed out with PERSON A's mouth open and eyes closed. The investigator who saw PERSON A is an experienced drug-trafficking investigator; he has noted that PERSON A's appearance was consistent with the appearance of people who are high.

Further, the investigator saw a piece of tinfoil, a lighter, and a short straw (with one end appearing to be burnt) next to PERSON A on the seat. These items, I am aware, are used by drug users to smoke drugs. The investigator knocked on the window to see if PERSON A was responsive, and saw that PERSON A was. The investigator did not have further interaction with PERSON A at that time.

18. Subsequently, on Wednesday, February 8, investigators again set up surveillance at the office park. Shortly after 10:00 a.m., the Mercedes Benz appeared at the office park, and the geolocation information for the car corroborated its location. PERSON A had shown up at the office park shortly before the Mercedes Benz, and investigators saw PERSON A get into the Mercedes Benz. Once PERSON A was in the Mercedes Benz, investigators approached it to conduct a vehicle stop.[1] When investigators approached the Mercedes Benz, they used a bullhorn to order the driver to get out and show their hands. RAMIREZ, however, did not comply with the commands; rather, investigators saw, he rapidly manipulated his phone, **Target Telephone 1**, in what I believe was a likely effort to delete content. He continued to do this even after investigators specifically ordered him to put the phone down. RAMIREZ did get out of the car while manipulating **Target Telephone 1**, and investigators had to force him to the ground and remove the phone from his grasp. Investigators seized **Target Telephone 1**, which I have in my custody. In the subsequent search of RAMIREZ, investigators found **Target Telephone 2**, which I also have in my custody.

19. PERSON A separately was ordered to get out of the Mercedes Benz, and PERSON A complied without incident. PERSON A was detained, and PERSON A agreed to make a statement (after receiving *Miranda* rights). In substance, PERSON A told

---

[1] When reviewing K.W.P.'s phone, investigators saw a video that Dogwater sent, which showed a hand holding a block of a white powdery substance that resembled cocaine. Next to the substance, investigators could clearly see a handgun with a magazine loaded. Given the concern that RAMIREZ could be armed, investigators conducted this stop using a tactical team.

investigators that PERSON A purchases M30 pills from RAMIREZ regularly. PERSON A purchases two pills at a time, often more than once per day, and had been purchasing from RAMIREZ since December 2022. PERSON A also told investigators that PERSON A had phone numbers for RAMIREZ saved in PERSON A's phone, which PERSON A allowed investigators to review. (That phone too has been seized, and is in my custody.) In the phone, investigators saw the 4399 Number associated with "Dogwater," and PERSON A told investigators that this was an older phone number for RAMIREZ. PERSON A elaborated that PERSON A had been contacting RAMIREZ on a newer number since around the first of the year (*i.e.*, January 1), and that the 4399 Number was now a "backup" number for him. PERSON A had stored the 4399 Number under the contact, "Daniiella," and I note that RAMIREZ's middle name is Daniel. PERSON A said that PERSON A knew RAMIREZ as "Danny," and had saved the newer contact for him as "daniella." I note that this further tends to confirm that RAMIREZ is the dealer who used the 4399 Number, and I further note that per PERSON A's statement, RAMIREZ got a new phone number to communicate with at least customer (PERSON A) around the same time that K.W.P. died. Finally, PERSON A told investigators that PERSON A had known K.W.P., and could confirm that RAMIREZ had been a dealer for K.W.P.

20. Contemporaneously with these events, investigators executed a search warrant at the home where RAMIREZ resides with his mother and sister. In RAMIREZ's room, investigators found fourteen small baggies containing blue "M30" pills, and a fifteenth larger bag containing a larger quantity of these pills. I am aware that all together, these bags contained about 2,600 M30 pills, which had a gross weight of 283.35 grams. Investigators also found a quantity of a white pearlescent substance that tested presumptively positive as cocaine, and two handguns (both manufactured by Glock). They also found a digital scale, dozens of unused small baggies, and 109 pills that appear to be benzodiazepines (but for which testing is pending). In addition, I note that investigators found **Target Telephones 3**, **4**, and **5** in RAMIREZ's room and seized them; two were on RAMIREZ's pillow, and the other in a closet. From my training and experience, I assess

that these items are all indicative of drug trafficking. Principally, RAMIREZ was in possession of about 2,600 counterfeit pills consistent with the appearance of fentanyl-laced pills. Corroborating that understanding, PERSON A has said that PERSON A bought fentanyl-laced pills from RAMIREZ on a near-daily basis and intended to purchase such pills on this day. Further, I am aware that drug dealers often have quantities of small baggies that they use to prepare small quantities of drugs for sale to customers; digital scales to weigh their drugs; firearms to protect themselves and their stashes; and multiple phones to use for their distribution activity.

21. In addition to the foregoing, I note that in a photograph that Dogwater sent to K.W.P., a radar detector – a device commonly used to detect radar speed guns used by law enforcement to catch speeding vehicles – can be seen on mounted to the windshield of the car that Dogwater is sitting in. At the time of the stop on February 8, investigators saw a radar detector mounted to the windshield of the Mercedes Benz. The radar detector seen on February 8 is indistinguishable from the one in the photograph sent by Dogwater, and it appears mounted in the same spot on the windshield. That said, the photograph sent by Dogwater is not the interior of the Mercedes Benz. PERSON A has explained that RAMIREZ has used multiple cars. Further, DMV records show that RAMIREZ did not obtain the Mercedes Benz until at least two weeks after K.W.P. died

## IV.
## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

22. Based upon my experience and training, consultation with other law enforcement officers experienced in drug investigations, and all facts and opinions set forth in this affidavit, I know that:

   a. Individuals involved in drug distribution activity use cellular telephones and electronic communication devices to conduct their criminal activities. An examination of the **Target Telephones** will enable investigators to establish further evidence of drug distribution, and co-conspirators. That evidence is, I

        believe, likely to include information pertinent to distribution of controlled substances.

b. Cellular telephones and electronic communication devices (Tablets, I-Pads, etc.) are capable of storing many different types of data that are invaluable to investigators and could be evidence of criminal conduct. This data, sought pursuant to the requested search warrants, consists of the contents of the cell phones' or electronic communication devices' memory, including: stored names and telephone numbers in the memory, "phonebook" or list of contacts, and/or speed dial functions of the phones; phone numbers dialed for the most recent outgoing or "sent" calls of the telephones, along with date and time of call data; phone numbers dialing the telephones for the most recent incoming "received" calls, along with date and time of the call data; phone numbers dialing the telephone for the most recent "missed" calls, along with the date and time of call data; GPS navigation information; internet searches and websites viewed; and deleted data.

c. Drug traffickers commonly use cellular telephones, blackberries, PDAs, electronic communication devices, other personal handheld electronic devices, and laptop and desktop computers to communicate with, among others, their customers, their suppliers, and other criminal associates, and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. Drug traffickers also commonly store records of the business of distributing and selling drugs on telephones, computers, and other forms of digital media.

d. In addition to their use of computers and digital media, persons involved in drug trafficking activity often use mobile phones in furtherance of these activities. When used in this manner, the mobile phones typically contain data constituting evidence of these activities. Many current mobile phones are

sophisticated computing devices and are capable of performing many of the same functions as computers. They are commonly used in furtherance of illicit activity in the same manner as computers.

23. Here, in light of the investigation to date, I seek authority to search the **Target Telephones** from February 8, 2022, through the present. Evidence shown here indicates that RAMIREZ has been a supplier of controlled substances – particularly fentanyl – for some time. Given the length and nature of RAMIREZ's apparent activity, I submit that review of the **Target Telephones** for a year reflects a conservative estimation of his possible trafficking activity. (I further seek authority to search the **Target Telephones** to the present because I am aware that when a trafficker is arrested, customers and co-conspirators do not always learn of the arrest right away and can try to reach out to the arrested person.) Accordingly, I request permission to search **Target Telephone 1** for data beginning on February 8, 2022, up to and through the present.

24. To date, investigators have not attempted to acquire the contents of the **Target Telephones** by other means.

V.

## PROCEDURE FOR ELECTRONICALLY STORED INFORMATION AS TO ANY CELLULAR TELEPHONES

25. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.

Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26.   Following the issuance of this warrant, agents will collect **Target Telephone 1** and subject it to analysis. All forensic analysis of the data contained within **Target Telephone 1** and the memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

27.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## VI.
## CONCLUSION

28.   Based upon my experience and training, consultation with other law enforcement officers experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists to conclude that **Target Telephone 1**, as further described in Attachments A-1 through A-5, incorporated herein, was utilized to facilitate violations of Title 21, United States Code, Sections 841(a), 841(b)(1), and 846. Furthermore, I believe there is probable cause to conclude that the **Target Telephones** contain stored data that constitutes evidence, fruits, and

instrumentalities of such violations, and I respectfully request warrants be issued authorizing a search for and seizure of that data, as further described in Attachment B, incorporated herein. For the reasons provided, I seek authority to search **Target Telephone 1** from February 8, 2022, through the date of this warrant.

   I swear the foregoing is true and correct to the best of my knowledge and belief.

                    Task Force Officer Douglas Morse
                    Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 5.1 this 10th day of February, 2023.

The Honorable Michael S. Berg
United States Magistrate Judge

**Attachment A-2**

*Item to be Searched*

The item to be searched is as follows:

- A purple Apple iPhone with black case, seized from the person of Jose Daniel RAMIREZ on February 8, 2023 ("**Target Telephone 2**").

The **Target Telephones** are currently in the custody of Homeland Security Investigations, 2055 Sanyo Avenue, Suite 120, San Diego, CA 92154.

## Attachment B

### *Items to be Seized*

Authorization to search the **Target Telephones** described in Attachments A-1 through A-5 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Telephones** for evidence described below. The seizure and search of the **Target Telephones** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Telephones** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, between the dates of February 8, 2022, and the date of this warrant authorization:

   a. tending to indicate efforts to distribute federally controlled substances and conspire to do the foregoing;

   b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the distribution of federally controlled substances and conspire to do the foregoing;

   c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of federally controlled substances and conspire to do the foregoing;

   d. tending to identify travel to or presence at locations involved in the distribution of federally controlled substances and movement of cash proceeds, such as stash houses;

   e. tending to identify the user of, or person(s) with control over or access to, **Target Telephone 1**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 841(a), 841(b)(1) and 846.